Argued and submitted January 29, affirmed November 4, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TIMOTHY LEE McCANTS,
*Defendant-Appellant.*

Marion County Circuit Court
06C44334; A134846 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CYNTHIA GENEVA WALKER,
*Defendant-Appellant.*

Marion County Circuit Court
06C45185; A134848

220 P3d 436

Ryan T. O'Connor, Deputy Public Defender, argued the cause for appellants. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Rosenblum, Judge, and Deits, Senior Judge.

HASELTON, P. J.

## HASELTON, P. J.

Defendants Timothy McCants and Cynthia Walker, who were jointly tried, appeal, challenging their convictions on three counts each of first-degree criminal mistreatment, ORS 163.205(1)(a), which were based solely on conditions in defendants' home. Each defendant contends on appeal that the state's proof was legally insufficient to establish that he or she "intentionally or knowingly with[held] necessary and adequate * * * physical care," ORS 163.205(1)(a), from any of defendants' children. As explained below, we conclude that, viewing the evidence and reasonable attendant inferences in the light most favorable to the state as the prevailing party, *see State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998), defendants' challenge to the sufficiency of the state's proof fails. Accordingly, we affirm.

We recount the material facts, as established by the evidence at trial, consistently with our standard of review: Defendants lived with their three children, I (three years old), T (two years old), and C (five and one-half months old). On the afternoon of April 12, 2006, Salem Police Officers Moffitt and McCarley came to defendants' home to investigate a complaint of suspected drug activity.

When the officers approached the house, they observed a large stack of garbage near the garage, and stacks of boxes, sacks, and other items on the enclosed porch. Outside the front door, there was a "strong unpleasant odor of * * * garbage and dirty laundry" with "a little bit of urine or feces mixed in." Through the front window of the house, the officers saw into defendants' living room. They could see a couch covered with laundry and that the living room floor was "filthy," strewn with garbage, old food debris, and several soiled diapers.

The officers spoke with McCants at the front door. Moffitt explained to McCants that they were there to investigate suspected drug activity and that "the easiest way" to resolve the complaint would be to "take just a minute and walk us through the residence." McCants responded that he

understood, but that he did not want the officers to enter. Moffitt

> "then explained to [McCants]—while I was talking to him, I could see his daughter, [I], running around the living room behind him, so I knew that there were children present. I told him I was concerned—based on what I could see of the conditions of the house, I was concerned for the welfare of the kids, and I couldn't just walk away."

McCants acknowledged the house was messy, but maintained that the children were "okay." Even though the children appeared healthy and well fed, the officers placed defendants under arrest for criminal mistreatment in the first degree based on the condition of their home.

The officers then requested and received consent from the defendants to search their house. While Moffitt stayed with defendants in the living room, McCarley inspected the house, taking photographs. The house was littered throughout with food debris, laundry, garbage, and toys. Moffitt saw "several choking hazards" on the living room floor, which was cluttered with "several" pieces of plastic, plastic bags, and toys. According to Moffitt, "[i]t appeared to be very unsafe, * * * just [from] what I could see in the living room without looking at the rest of the house." At one point, McCarley saw T, the two-year-old, who had been sleeping in defendants' bedroom unattended, "holding a really small toy[ ] and * * * trying to put it in his mouth." McCarley was concerned that the small toy presented a "choking hazard."

The doorway to T and I's shared bedroom was partially blocked by a cabinet, and the floor was cluttered with toys, food containers, and garbage. McCarley believed those conditions created a fire hazard.

In the kitchen, the counters were "covered with old food containers, garbage, dirty dishes, [and] tools," the garbage was overflowing, and there was evidence of an ant problem. The refrigerator was clean and full of food. In the dining area, there were two plates with old food and a partially eaten apple. The bathroom was relatively clean except for a dirty diaper on the floor.

The garage, which was "packed full" of boxes and other items, was separated from the house by a locking door—and defendants claimed that they kept that door locked to keep the children out of the garage. However, when McCarley and McCants went into the garage, the two oldest children, I and T, followed them "without being corrected."

In the laundry area, which was accessible through the garage, there was a "[r]eally strong odor of mildew and mold," and laundry detergent and open bleach containers were strewn about. Walker told McCarley that there was a "huge" rat that had been living in the roof above the garage for "about a month" and that the rat would go into the laundry room. Defendants had set traps for the rat and had reported the problem to their landlord.

With respect to the duration and degree of the conditions in the home, McCants told Moffitt that the house had been "much worse * * * a couple of days before," and "even worse before that," but that it had only been messy for a total of "less than two weeks." According to McCarley, McCants admitted that the house was "now * * * spotless" compared to how it looked "a few months" before. Walker told McCarley that the house had been in this condition for a "few weeks" but that it had "mostly * * * gotten * * * bad in the past few days."

McCants admitted that the condition of the home was "unacceptable" for children and that the pieces of plastic presented a "choking hazard." Walker admitted that the home was "not acceptable for her three kids." At trial, she also acknowledged that the presence of small toys (*e.g.*, Barbie doll accessories) belonging to her oldest child, I, located in the bedroom I shared with T, were "choking hazards" to the younger children, T and C, but claimed that I had scattered the toys just before McCarley inspected defendants' home. Usually, Walker claimed, the toys were kept in a locked closet and brought out only when the two younger children were not around.

McCarley believed that defendants' house was not a safe environment for the children based on the combination of "the odor, the garbage, * * * the clutter, [and] the choking

hazards" present. Moffitt believed that the house was not safe for similar reasons. At some point, the officers called for a City of Salem code enforcement officer, who described the house as "very messy" and posted a sign designating defendants' house as a public nuisance. When the code enforcement officer returned to the house approximately two weeks later, the conditions had been rectified.

Defendants were each charged with three counts of criminal mistreatment in the first degree for "knowingly withhold[ing] necessary and adequate * * * physical care," ORS 163.205(1)(a), from each of their three children. Defendants waived a jury trial and were tried jointly to the court.

At the close of evidence, neither defendant moved for a judgment of acquittal (MJOA). However, in closing argument, Walker's counsel did argue that there was insufficient evidence for the trial court to find that defendants' conduct constituted "withhold[ing] necessary and adequate * * * physical care." ORS 163.205(1)(a). In advancing that contention, Walker's counsel did not distinguish between or among the three counts against her client; rather, the assertion of evidentiary insufficiency pertained generically to the three counts as an undifferentiated whole—*i.e.*, the conditions in the home were not of such a nature and degree that they presented a culpable risk to *any* child. McCants's counsel, whose closing argument followed, similarly, generically disputed the legal sufficiency of the state's proof, again without differentiating among individual counts.

The trial court convicted defendants on all counts, finding that "[t]his is just not a dirty house, and it's not a house that got this dirty over two days of [Walker] being sick. This house is absolutely filthy, and I consider it a danger to those children."

On appeal, each defendant raises three assignments of error, asserting that the state's proof as to each count on which he or she was convicted (relating to each of the three children) was legally insufficient. Defendants advance one common argument as to all six assignments of error—that is, they make no effort to distinguish between themselves as to their respective mental states or to distinguish among the

circumstances of the three children and nature or degree of any risk presented to them, individually, by various conditions in the home.

Rather, as before the trial court, the overarching gravamen of defendants' position is that there is insufficient evidence to support *any* of their convictions for criminal mistreatment in the first degree. Specifically, defendants contend that the extant conditions in their home, and any failure to address those conditions, did not constitute "withhold[ing] necessary and adequate * * * physical care" within the meaning of ORS 163.205(1)(a) because those conditions did not present a "significant likelihood of serious harm" to any of their children. Defendants further argue that, even if conditions in their home were likely to cause their children serious harm, there is no evidence that they had knowledge of that fact.

The state responds that ORS 163.205(1)(a) does not require the state to prove that defendants' conduct was likely to cause their children serious harm or that they knew that it was likely to cause serious harm.

We begin, as we must, *see State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000), with preservation. As noted, here, neither defendant challenged the legal sufficiency of the state's proof by way of a motion for judgment of acquittal. Nevertheless, in a bench trial, a defendant may also preserve a challenge to the legal sufficiency of the evidence by clearly raising the issue in closing argument. *State v. Forrester*, 203 Or App 151, 155, 125 P3d 47 (2005), *rev den*, 341 Or 141 (2006); *State v. Gonzalez*, 188 Or App 430, 431, 71 P3d 573 (2003). In all events, whether by way of a motion for judgment of acquittal or in closing argument, a defendant must sufficiently identify the asserted legal insufficiency of the state's proof so that the trial court is sufficiently alerted to that deficiency as to permit the court "to consider and correct the error immediately, if correction is warranted." *Wyatt*, 331 Or at 343; *see also State v. Spears*, 223 Or App 675, 680-81, 196 P3d 1037 (2008).

Here, the question of preservation is close—as it is almost invariably when defendants, rather than separately

moving for a judgment of acquittal, conflate MJOA-like contentions into closing argument in a court trial.[1] Nevertheless, each defendant, through his or her closing argument, not only disputed the relative weight and persuasiveness of the parties' evidence, but also sufficiently alerted the trial court that he or she was contending that the state's proof regarding conditions in the house, individually or collectively, was legally insufficient to support a conviction under ORS 163.205(1)(a).

That does not, however, end our preservation inquiry. The question remains: Exactly *what* was preserved? That is, what were the contours of defendants' contentions pertaining to the insufficiency of the state's proof? As noted, both defendants' arguments in that regard were general, without differentiating among the individual counts (which, in turn, corresponded to each of the three children). Closing argument for Walker, albeit perhaps the more cogent, is exemplary:

> "This was a messy house, but it was not a house where the level of mess had risen to the level of being consistently dangerous for these three children. I don't think the Court can find beyond a reasonable doubt that Ms. Walker or Mr. McCants knowingly withheld * * * necessary and adequate physical care from their children."

Thus, as framed before the trial court—and, concomitantly, preserved for our review—defendants' position was "all or nothing." That is, the state's proof was legally insufficient to support a conviction on *any* count because the conditions in the home were not of such a nature and degree that they presented a culpable risk to *any* child. The practical and prudential consequence of that indiscriminate tactical approach is that, if we reject that proposition, the evidence is, necessarily, sufficient as to all counts against each defendant. It is not for us to invent arguments for the parties—*e.g.*, to distinguish among the individual counts with respect to

---

[1] Trial lawyers who forgo MJOAs and raise "legal insufficiency" contentions solely in closing argument are, inexplicably, courting nonpreservation—and consequent inadequate assistance and malpractice claims.

the particular circumstances of the child identified as the victim in that count—that they did not, and do not, advance for themselves. *Cf. Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) (noting generally that, "it is not this court's function to speculate as to what a party's argument might be" or "to make or develop a party's argument when that party has not endeavored to do so itself").

Before addressing the legal sufficiency of the evidence as to the parallel counts on which defendants were convicted, we believe that it is important and appropriate, given the circumstances of this case, to make two overarching observations.

*First*, this is merely the latest of a series of cases in recent months in which this court has been called upon to review the sufficiency of evidence to support convictions of parents who have been charged with criminal mistreatment of their children based solely on conditions existing in the family's home. *See, e.g., State v. Dowty*, 230 Or App 604, 216 P3d 911 (2009); *State v. Baker-Krofft*, 230 Or App 517, 216 P3d 335 (2009).[2] The apparent proliferation of prosecutions under the criminal mistreatment statutes in circumstances similar to those presented here is potentially problematic. That is so because of the "broad range of conduct" encompassed within the statutory term "necessary and adequate * * * physical care," *Baker-Krofft*, 230 Or App at 523, which, in turn, includes " 'attention to dangers in the body's environment.' " *Id.* (quoting *State v. Damofle / Quintana*, 89 Or App 620, 624, 750 P2d 518, *rev den*, 305 Or 671 (1988)). "[D]angers in the body's environment" can, at least arguably, include myriad common hazards (*e.g.*, "choking hazards") found in tens of thousands of Oregon homes in which small children reside. Thus, although the statutory language is not unconstitutionally vague, *see Damofle / Quintana*, 89 Or App at 625, the potential for selective prosecution is patent. *Accord Dowty*, 230 Or App at 611 (noting that there are "a number of items in every home [that] inevitably include[ ] some inherent dangers" to children and concluding that ORS

---

[2] Convictions in other cases have been affirmed without opinion.

163.205 does not "criminalize physical care * * * simply because it does not safeguard against every possible danger").

    *Second*—and in marked contrast to our review of an imposition of juvenile dependency jurisdiction based on conditions in a family's home, in which we may elect to review the underlying evidence *de novo*, ORS 19.415(3)(b)—our review in this criminal case is narrowly confined to determining whether the evidence, when viewed most favorably to the state, is legally sufficient to support a conviction. *See, e.g.*, *Hall*, 327 Or at 570. It is axiomatic that, if that standard is satisfied, we must affirm even if we would not have convicted in the first instance. But even more to the point here, our review in this posture pertains solely to the sufficiency of the proof and not to the correctness, or coherence, of any rationale expressed by the trier of fact in determining guilt. Thus, although we conclude, as we shall explain, that the state's proof in this case was legally sufficient, we imply no endorsement of the trial court's rationale that, by itself, a parent's failure to rectify "absolutely filthy" conditions in a family home violates the criminal mistreatment statutes.

■    We turn, then, to the legal sufficiency of the state's proof to establish a violation of ORS 163.205(1)(a). That statute provides, in part:

> "A person commits the crime of criminal mistreatment in the first degree if:
>
> "(a)   The person, in violation of a legal duty to provide care for another person, * * * intentionally or knowingly withholds necessary and adequate * * * physical care * * * from that other person[.]"

ORS 161.085(8), in turn, provides:

> " 'Knowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists."

    As noted above, the scope of the pivotal statutory term "withholds necessary and adequate * * * physical care" from the dependent person is imprecise—especially with

respect to culpable "[in]attention to dangers in the body's environment." *Damofle / Quintana*, 89 Or App at 624. Indeed, concrete definition has been consigned to case law development, which, until very recently, has been sparse. Given that paucity of precedent, our decisions in *Baker-Krofft* and *Dowty*—which, in many ways, can properly be regarded as "bookends"—are highly instructive. To be sure, we did not purport, in either case, to identify or derive common principles or considerations that properly inform and limit the imposition of criminal liability based on failure to rectify potential hazards in a dependent person's home. Nevertheless, the two cases, considered in combination, are illuminating in that regard.

In *Baker-Krofft*, we held that there was sufficient evidence to support the defendant's conviction for criminal mistreatment in the second degree, ORS 163.200.[3] 230 Or App at 524. In so holding, we determined that the state's evidence of "a present risk of fire in the home" was "dispositive." *Id.* at 523. In that regard, we noted that the evidence of fire hazards included overloaded electrical outlets that were warm to the touch and near a "heavy 'fuel load,' " the absence of working smoke alarms, and clutter "so massive that it would impede any timely escape" in the event of a fire. *Id.* at 523-24.

In contrast, in *Dowty*, we reversed the defendants' convictions for first-degree criminal mistreatment. 230 Or App at 611. We concluded that the state's evidence pertaining to three types of purported hazards was legally insufficient to establish a culpable withholding of necessary and adequate physical care.

First, the state had presented evidence of "fire hazards"—specifically, plastic containers and cardboard on a stovetop, two space heaters operating near flammable material, and sufficient household clutter to block timely escape in the event of a fire. *Id.* at 610. However, we concluded that that evidence failed to establish any *"present* risk of fire"

---

[3] ORS 163.200 differs from ORS 163.205 with respect to the culpable mental states—*viz.*, "with criminal negligence" for the former as opposed to "intentionally or knowingly" for the latter. The operative "withhold[ing] necessary and adequate * * * physical care" language is common to both statutes.

because the stovetop was turned off and because the space heaters had sensors that would automatically shut off the heater if the surrounding items got too hot. *Id.* (emphasis in original). We further determined that, in the absence of a present risk of fire, or of evidence that "the clutter affected the children's bodily safety and well-being in some other way," failure to rectify "clutter on its own" would be insufficient to support a conviction for criminal mistreatment. *Id.*

Second, the state had presented evidence that there were prescription pill bottles within the physical reach of the defendants' children, ages five and two. *Id.* However, that evidence was insufficient to establish culpability under ORS 163.205(1)(a) because it was undisputed that the bottles were secured with childproof caps and there was no evidence that the children had access to the pills inside. *Id.*

Finally, in *Dowty*, we concluded that evidence that there were two knives and a hammer lying on the kitchen counter was similarly legally insufficient. We acknowledged that the knives and hammer were "capable of inflicting serious bodily harm" but concluded that

> "the same is true of a number of items in every home, which inevitably includes some inherent dangers. We cannot say that, in enacting ORS 163.205, the legislature likely intended to criminalize physical care * * * simply because it does not safeguard against every possible danger."

*Id.* at 611. In so concluding, we noted, parenthetically, that, although the defendants claimed that they "always" used a baby gate to block the entrance to the kitchen to protect against hazards like the knives and hammer, there was no baby gate in place on the night of their arrest. *Id.* at 606-07, 610.

■  Thus, *Baker-Krofft* and *Dowty*. Implicit in our analysis and disposition of those cases are several factors bearing on the assessment of the legal sufficiency of asserted "dangers in the body's environment," *Damofle / Quintana*, 89 Or App at 624, and purported inattention to those "dangers." Those considerations, which are necessarily nonexclusive, include the following:[4]

---

[4] We appreciate the jurisprudential pitfalls of explicitly identifying such considerations—which, all too often, spawns multifactoral, "mix-and-match"

(1)   *The nature of the harm that the condition presents to the dependent person.* For example, a hazard may be lethal (*e.g.*, a loaded firearm within easy reach of a toddler) or merely potentially injurious (*e.g.*, broken glass on a floor on which a teenager might cut his or her foot). In *Baker-Krofft*, especially given the lack of smoke alarms and obstacles to escape, fire was a lethal hazard.

(2)   *The temporal immediacy of the harm.* All other considerations being equal, the failure to address a condition that can, or will, cause harm immediately (*e.g.*, the *"present* risk of fire" in *Baker-Krofft*, 230 Or App at 523 (emphasis added)) is more serious, and potentially culpable, than failure to address a condition that could, if not rectified in the interim, cause harm in the future.

(3)   *The likelihood of the potential harm to the dependent person actually being realized.* Again, all other considerations being equal, the greater the likelihood that the harm will occur—*i.e.*, ranging from speculative possibility to virtual certainty—the more serious, and potentially culpable, is the failure to address the potentially hazardous condition. Thus, in *Dowty*, there was *some* possibility, however remote, that one of the young children *might* grab the hammer or knife on the kitchen counter and do some harm to herself or her sibling, but, apparently, there was no proof that either had ever done such a thing or was, in fact, somehow likely to do so. *See Dowty*, 230 Or App at 611.

(4)   *The duration of the dependent person's exposure to the risk of harm.* This consideration is not directly implicated in *Baker-Krofft* or *Dowty*—and may be a component of the likelihood of harm being realized. As an actuarial matter, in many, albeit not all, circumstances, prolonged exposure to risk enhances the likelihood of harm. Consider, for example, the differences between a toddler having ready access to a loaded firearm for five seconds, five minutes, and five hours.

(5)   *The nature and extent of remedial / supervisory measures to mitigate the potential harm.* In *Baker-Krofft*, we emphasized the absence of working smoke alarms, 230 Or

prescriptive methodologies. Nevertheless, in this context, greater definition informing the application of the statute is useful—and, perhaps, imperative.

App at 524; conversely, in *Dowty*, we emphasized, variously, the existence of automatic shut-off sensors on the space heaters, the childproof caps on the prescription pill bottles, and, parenthetically, the parties' dispute regarding the use (or nonuse) of a baby gate to limit access to the knives and hammer and other common, but potentially dangerous, objects in the kitchen, 230 Or App at 610-11. Similarly, presentation, by way of defense, of evidence of parents' efforts to instruct and warn their children regarding risks in the home could be probative of this consideration.

With those considerations in mind, we return to the state's evidence in this case. As noted, given the holistic, all-or-nothing character of defendants' challenge to the sufficiency of the state's proof, if we reject that challenge, the evidence is necessarily sufficient as to all counts against that defendant.[5] For the reasons that follow, we conclude that the state presented legally sufficient proof—specifically with respect to each defendant's failure to rectify choking hazards in the home—to establish that each defendant violated ORS 163.205(1)(a).[6]

With respect to choking hazards, the state presented evidence that the officers observed "several choking hazards" on the living room floor, including "several" pieces of plastic and plastic bags. Further, one of the officers saw T, the two-year-old, trying to put a small toy—which the officer described as a "choking hazard"—into his mouth. Viewed most favorably to the state, the evidence, including McCants's admissions to the officers regarding the duration of the conditions in the house, supported a reasonable inference that the presence of readily accessible choking hazards was persistent, continuing over a period of days or even weeks, and not merely momentary or incidental. Finally, McCants acknowledged that the pieces of plastic presented a choking hazard, and Walker acknowledged that, at least,

---

[5] Again, defendants do not attempt to argue that, because of differences in the age and other circumstances of the three children, even if evidence was sufficient as to one count pertaining to one child, it was not sufficient with respect to another count pertaining to another child.

[6] Given that conclusion, we do not address, and imply no view, whether the state's proof of other conditions in defendants' home was legally sufficient for purposes of ORS 163.205(1)(a).

some of the oldest child's small toys and accessories presented a choking hazard to the two younger children.

We are mindful that the term "choking hazard" is amorphous and that it is inevitable, in millions of American homes, that small children will sometimes be exposed to such hazards. Parents, despite their best, most vigilant efforts, are not perfect—and the law does not demand omnipresence or omniscience. Thus, echoing *Dowty*, we do not believe that the legislature, in enacting the criminal mistreatment statutes, "intended to criminalize" incidental exposure to choking hazards. *Dowty*, 230 Or App at 611.

Nevertheless—and with fidelity to our standard of review—the evidence here showed more than mere incidental or isolated exposure. Harkening to the considerations we have previously posited, *see* 231 Or App at 582-83, the hazard was not only potentially lethal and immediate (the same could be said of many common choking hazards) but also relatively pervasive and temporally durable and persistent. The trier of fact could reasonably infer that there were multiple choking hazards easily accessible to children for an extended period of time and that defendants, notwithstanding their awareness of the attendant risk, had done little, if anything, to rectify that condition. Further, the evidence demonstrated that the likelihood of harm was real, and not merely hypothetical or abstract: T, the two-year-old, did, in fact, try to put one of the choking hazards into his mouth.

The totality of that evidence was sufficient to establish that defendants knowingly withheld necessary and adequate physical care from their children in violation of ORS 163.205(1)(a).

Affirmed.