Argued and submitted January 27, at University of Oregon, Eugene, convictions
for first-degree criminal mistreatment in Counts 18-25 reversed; remanded for
resentencing; otherwise affirmed September 8, petition for review denied
December 1, 2011 (351 Or 401)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ROBYN KAY DROWN,
*Defendant-Appellant.*

Marion County Circuit Court
08C44786; A141333

263 P3d 1057

Bear Wilner-Nugent argued the cause and filed the brief
for appellant.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the briefs were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

This is a criminal case in which defendant appeals a judgment convicting her of 12 counts of second-degree assault, ORS 163.175, two counts of fourth-degree assault as a lesser included offense, ORS 163.160, and nine counts of first-degree criminal mistreatment, ORS 163.205, arguing that the trial court erred by denying her motions for judgments of acquittal on each count. For the reasons explained below, we affirm defendant's assault convictions (Counts 1 through 14) and one of her criminal mistreatment convictions (Count 17), and we reverse her other criminal mistreatment convictions (Counts 18 through 25).

We begin with the facts, which we state in the light most favorable to the state. *State v. Baker-Krofft*, 348 Or 655, 658 n 1, 239 P3d 226 (2010). In 2008, defendant and her husband, Drown, lived with the youngest nine of their children— D, A, Jo, Ju, M, S, R, Nv, and Nc—who ranged in age from a few months old to 16 years old.[1]

Drown was verbally and physically abusive to defendant and their children. He was very controlling and limited the family's contact with others. The children did not attend school; they helped at home and with the family's construction business.

Drown inflicted corporal punishment on defendant and their children. Defendant also inflicted corporal punishment on the children herself. After the oldest child reported Drown and defendant's actions to a member of the family's synagogue, the Department of Human Services (DHS) took the children into protective custody, and Drown and defendant were prosecuted for their mistreatment of their children.

Defendant was charged by indictment with 14 counts of second-degree assault,[2] committed between January 1,

---

[1] Defendant and Drown have 12 children. This case concerns only the youngest nine children.

[2] ORS 163.175 provides, in part:

"(1) A person commits the crime of assault in the second degree if the person:

2008 and June 19, 2008. The counts were based on defendant's use of objects—ranging from a board to a tent pole—to punish the oldest seven of the nine children. Each count alleged that defendant knowingly caused physical injury to a particular child using a particular object.

Defendant was also charged with 11 counts of first-degree criminal mistreatment.[3] The first two counts, Counts 15 and 16, alleged that, on or between May 15, 2008 and June 19, 2008, defendant, "in violation of a legal duty to provide care for [her dependent children], did unlawfully and knowingly cause physical injury to [her dependent children]." Those counts related to R and Nv. The remaining nine counts, Counts 17 to 25, alleged that, on or between January 1, 2008 and June 19, 2008, defendant, "in violation of a legal duty to provide care * * * did unlawfully and knowingly withhold necessary and adequate physical care [from her children]." Each of those nine counts related to a different child.

Defendant and Drown were tried together, before a jury. In support of the assault counts, the state presented evidence that, over the years, including during the time period alleged in the indictment, the oldest seven of the nine children were punished by being repeatedly struck with objects on their buttocks, the backs of their legs, and their arms. The children suffered pain, bruising, cuts, and scars as a result. The punishments were frequent and severe. Several of the children testified that each beating involved numerous blows, ranging between "five and 100s," depending on the

---

"* * * * *

"(b) Intentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon[.]"

[3] ORS 163.205 provides, in part:

"(1) A person commits the crime of criminal mistreatment in the first degree if:

"(a) The person, in violation of a legal duty to provide care for another person, * * * intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person; or

"(b) The person, in violation of a legal duty to provide care for a dependent person or elderly person, * * * intentionally or knowingly:

"(A) Causes physical injury or injuries to the dependent person or elderly person[.]"

severity of the infraction for which the child was being punished.

In support of the criminal mistreatment counts, the state presented evidence regarding the condition of the family's home—specifically, that it was cramped and cluttered—and that Drown and defendant had failed to take the children for routine medical and dental examinations or have them immunized. The state also presented evidence that the oldest child, D, had vision problems. D testified that he was "legally blind," and a member of the family's synagogue testified that D could not see to read and that it was obvious that D needed glasses. D testified that Drown had told him that, "if [he] fixed [his] spiritual eyesight that [his] physical eyesight would repair itself." In addition, the state presented evidence that four of the other children, A, Jo, Ju, and S, had dental problems that were diagnosed after they were taken into DHS custody. A and S needed fillings, and Jo and Ju needed root canals.

Drown and defendant had never taken any of the children to a doctor or dentist. When asked what she would do when her children had toothaches, defendant replied that she would "cut back on their sugar to reduce inflammation and to have them drink lots of water." Defendant testified that she was not allowed to take the children to the dentist.

Defendant advanced a duress defense; she presented evidence that Drown had severely abused her—verbally and physically—throughout their marriage. She testified that, after repeated attempts to escape the marriage, she eventually came to believe that her only way to save her life and her children's lives was to submit to Drown's wishes.[4] The children who testified at trial agreed that Drown was the source

---

[4] In support of her duress defense, defendant presented evidence that she was raised in a religious group that required its members to withdraw from the secular world and accept guidance from its ministers on life decisions. Her parents used corporal punishment, and they, and her religious community, taught her that to forgo such punishment was a sign of spiritual weakness and an absence of parental love. Defendant married Drown after he told her, when she was 16 and he was 22, that God had chosen her to be his wife. During their marriage, Drown preached to defendant and their children that he was the Messiah. He told defendant she was evil and damned, and he made her stand for hours at a time with her nose to the wall or floor, including when she was eight months pregnant and had a new baby in her arms. He abandoned her on wilderness roads and made her stay outside the family's home, in the elements, particularly when the family lived in rural Alaska.

of the violence in their family and that, although defendant also inflicted corporal punishment, she did so less often, less forcefully, and pursuant to Drown's will. The children also testified that, when defendant tried to intercede on their behalf, Drown punished her.

In addition to her duress defense, defendant also moved for judgments of acquittal on all counts, arguing that the state had failed to prove that she had used dangerous weapons against her children as alleged in the assault counts, and that the state had failed to prove that she had knowingly withheld necessary and adequate physical care from her children as alleged in the criminal mistreatment counts. The court denied the motions. The jury convicted defendant of second-degree assault on Counts 1 through 11 and 13, and of the lesser-included offense of fourth-degree assault on Counts 12 and 14. On the criminal mistreatment charges, the jury acquitted defendant of first-degree criminal mistreatment on counts 15 and 16 and convicted her of first-degree criminal mistreatment on counts 17 through 25. The trial court sentenced defendant to a total of 245 months' prison and 36 months' post-prison supervision.[5] This appeal followed.

On appeal, defendant raises two assignments of error. In her first, she assigns error to the trial court's denial of her motions for judgments of acquittal on the assault convictions. We reject that assignment without discussion, other than to say that a rational trier of fact could find, beyond a reasonable doubt, that defendant was liable, either directly or by aiding and abetting Drown, for physically injuring the children by striking them with objects that, given their physical attributes and manner of use, were readily capable of causing serious physical injury and, as such, were dangerous weapons. ORS 163.175(1)(b) (defining second-degree assault); ORS 161.015(1) (defining dangerous weapon); ORS 161.015(8) (defining serious physical injury).

We turn to defendant's second assignment of error regarding the trial court's denial of her motions for judgments

---

[5] Each second-degree assault conviction was punishable by a mandatory 70-month prison term. ORS 137.700(2)(a)(G).

of acquittal on the first-degree criminal mistreatment counts. Before addressing the merits of defendant's assignment, we must first address an argument that the state raises regarding preservation.

The state does not dispute that defendant moved for judgments of acquittal on the criminal mistreatment counts. Defendant did, both after the state's presentation of its case-in-chief and its rebuttal case. But, the state contends that, as a result of the manner in which defendant made her motions, defendant cannot secure the relief she seeks on appeal. Specifically, the state argues that, because "defendant's motion for judgment of acquittal did not differentiate between the individual counts, [defendant] has preserved only her claim that the evidence was insufficient to support a conviction on *any* of the counts." (Emphasis in original.)

The state bases its argument on our opinion in *State v. McCants/Walker*, 231 Or App 570, 577, 220 P3d 436 (2009), *rev'd on other grounds sub nom State v. Baker-Krofft*, 348 Or 655, 239 P3d 226 (2010). *McCants/Walker* involved two defendants charged with first-degree criminal mistreatment of their children based on the condition of their home. Each defendant was charged with three counts, one for each of their children, who ranged in age from five months old to three years old. The ages of the children were relevant because the state argued, *inter alia*, that the condition of the home put the children at risk because there were potential choking hazards in the house, including pieces of plastic on the living room floor and small toys in a bedroom. Neither defendant moved for judgments of acquittal. But, during closing argument, the defendants asserted that "the conditions in the home were not of such a nature and degree that they presented a culpable risk to *any* child." *Id.* at 575 (emphasis in original). The defendants' arguments were general and did not differentiate among the individual counts. As a result, we held that

"defendants' position was 'all or nothing.' That is, the state's proof was legally insufficient to support a conviction on *any* count because the conditions in the home were not of such a nature and degree that they presented a culpable risk to *any* child. The practical and prudential consequence of that indiscriminate tactical approach is that, if we reject

that proposition, the evidence is, necessarily, sufficient as to all counts against each defendant."

*Id.* at 577 (emphasis in original). We based that holding on our view that " 'it is not this court's function to speculate as to what a party's argument might be[.]' " *Id.* at 578 (quoting *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003)).

The state argues that, as in *McCants / Walker*, defendant "has preserved only her claim that the evidence was insufficient to support a conviction on *any* of the counts." (Emphasis in original.) Given the state's argument, it is necessary for us to describe, in some detail, the discussions that Drown's counsel, defendant's counsel, and the trial court had regarding the sufficiency of the evidence of the criminal mistreatment counts.

After the state presented its case-in-chief, Drown's counsel moved for judgments of acquittal first on the assault counts and then on the criminal mistreatment counts. Regarding the criminal mistreatment counts, Drown's counsel argued that the state had failed to prove that Drown's conduct constituted the withholding of necessary and adequate physical care. He specifically addressed the state's theories regarding the children's health and housing, arguing that neither the failure to take the children for routine examinations, nor the condition of the family home created any "serious health danger" to any of the children:

> "On counts 17 through 25, criminal mistreatment in the first degree; there's no evidence that Mr. Drown withheld anything from any of the children as testified. We talk about health; Dr. Strand admitted that failing to submit your child to a wellness exam once a year is not child abuse, let's say criminal mistreatment because of that. And he examined five healthy children at the time or soon after— you could almost call it immediately after the arrest.

> "There was no evidence that anybody had been in serious health danger by virtue of failing to get immunization. Indeed, Oregon law allows a parent to voluntarily withhold a vaccination, and there was no evidence that any of these

children had been exposed or had any history of any of the diseases for which they would be vaccinated.

"We talk about the condition of the house; there was only one opinion offered as to the condition of the house and yes, it was cluttered, but that didn't seem out of the ordinary given the number of people that were there. * * * [I]t certainly did not rise to the level of criminal mistreatment in the sense that we all are familiar with those kinds of 'messy houses.' "

Drown's counsel continued, arguing that the house was sufficiently clean and that there was "[n]o evidence, whatsoever, that [the children] were inadequately clothed, inadequately fed." He concluded:

"[S]ince it requires proof of withholding necessary and adequate physical care and if there is not even a scintilla of proof that that was withheld then it should not go to the jury. For that reason, the criminal mistreatment counts should all be dismissed."

Defendant's counsel joined in Drown's motions.

The trial court was aware that the motions for judgment of acquittal on the criminal mistreatment counts concerned the sufficiency of the evidence for each count—that is, for each child—as evidenced by the fact that, when Drown's counsel mentioned that he was not sure of the exact birth date of the youngest child, who was born during the six-month period of time alleged in the indictment, the trial court acknowledged that there would be a "much smaller [window] for [the youngest child]."

The trial court noted that the state had presented evidence that the youngest child was dirty when he was taken into DHS custody, and said that, in its view, that evidence was sufficient to make resolution of the count regarding that child "a question of fact for the jury." Regarding the other counts, the court had the following conversation with Drown's counsel and the prosecutor:

"THE COURT:   I have had significant factual evidence brought out with regard to poor teeth and vision, which still has to be tied to the timeframe. It's pretty clear with regard to [D], the eyesight thing. It's not a dirty house issue; I agree with you on that. And at some point in time I think

the State is going to need to identify what adequate care they're talking about with some specificity.

"[DROWN'S COUNSEL]: If I may respond to that?

"THE COURT: Yeah.

"[DROWN'S COUNSEL]: Isn't it their burden to have done it already by now?

"THE COURT: You know, you're right, but there's a factual basis for which they can, in the light most favorable to the State, at this point in time. If I have to revisit this issue after it goes to the jury then I will. But you understand, this is not a dirty house case, not a sewage case, not anything else.

"[PROSECUTOR]: It never was, Your Honor.

"THE COURT: But there are plenty of facts from which, if they choose to decide with regard—and it's all going to be within the timeframe. You tell me right now where you believe you are.

"[PROSECUTOR]: Your Honor, the State's theory of the criminal mistreatment in the first degree is based on the failure to provide medical care, dental care, the dirty clothes that were testified to, the general living conditions that were too small for the space. It wasn't that it was not clean; it was just that it was too small. * * *

"[T]he theory of the criminal mistreatment has always been that failure to provide the physical care; that is medical, dental and shelter."

Drown's counsel addressed the state's argument regarding the size of the home, and the trial court concluded the discussion, telling Drown's counsel, "Your objection's duly noted for the record and I'm going to deny your motion for judgment of acquittal with regard to counts one through 25."

After the state presented its rebuttal case, defendant's counsel renewed the motions for judgments of acquittal on all counts, first addressing the assault counts, then the criminal mistreatment counts. Defendant's counsel began his argument regarding the criminal mistreatment counts by asserting that there was no evidence that the children had

suffered any adverse consequences from defendant's failure to immunize them. The trial court interrupted, saying,

> "I don't think that was the only—if that was the way they were going to find it, I think you're right; that would be problematic. But to the extent that their teeth are rotting out of their head, at some point in time the jury could conclude that they were prevented or withheld necessary medical care[.]"

Making an argument in which defendant joined, Drown's counsel responded:

> "Our argument here is that there is no duty which has been produced by way of any evidence, medical or otherwise, and clearly no evidence other than the fact that some of the—and I disagree with the Court's characterization of the kids' teeth [as] rotten. Some have had fillings and one or two of them have had a root canal.
>
> "* * * * *
>
> "But that is not—there's no duty indicated that they had to go to a dentist a specific number of times prior to that and there's no evidence suggesting that those cavities did not occur within a couple of months prior to the time they came into custody. Kids have—I think it's common knowledge they have cavities all the time and they occur suddenly and what have you. There's no evidence in this case of lack of dental hygiene or lack of dental care. There is some testimony by [defendant] that if the kids had a sore tooth or something that she would look at it and inspect it and apply whatever home remedies that she did."

>    Drown's counsel continued, asserting that the parents' failure to take the children for routine medical examinations did not constitute criminal mistreatment, and pointing out that the doctors who examined the children after they were taken into DHS custody "saw these kids as well children." The trial court responded, "That's a question of fact for which the jury needs to determine. I don't disagree. They were a good-looking bunch of kids. All right." That concluded the discussion of the sufficiency of the evidence on the mistreatment counts.

As mentioned, the state does not dispute that defendant moved for judgments of acquittal on the criminal mistreatment counts. Instead, the state argues that the motions were not specific enough to preserve defendant's arguments that the state failed to present sufficient evidence to support *each* of her criminal mistreatment counts. We conclude that they were.

The test for whether an issue is preserved for appeal "is a practical one; it will depend on whether the policies behind the preservation requirement—judicial efficiency, full development of the record, and procedural fairness to the parties and the trial court—are met in an individual case." *Charles v. Palomo*, 347 Or 695, 700, 227 P3d 737 (2010) (internal quotation marks omitted). "A party ordinarily may preserve an issue for review merely by raising an issue at trial[.]" *State v. Haugen*, 349 Or 174, 190, 243 P3d 31 (2010).

Here, defendant moved for judgments of acquittal on each count of the indictment, including each criminal mistreatment count. A motion for judgment of acquittal is a motion for an acquittal on a particular count. Criminal charges are brought, tried, and decided on a count-by-count basis. *See* ORS 132.550(4) (an indictment shall contain a "separate accusation or count addressed to each offense charged, if there be more than one"); ORS 135.630(3) (a defendant may demur to an accusatory instrument that "charges more than one offense not separately stated").

As described, defendant joined in the motions for judgments of acquittal that Drown's counsel made at the close of the state's case-in-chief. Drown's counsel introduced the motions by specifically identifying the counts at issue, arguing that "[o]n counts 17 through 25" the state failed to present evidence that Drown "withheld anything from any of the children as testified." Drown's counsel grouped the motions because his argument regarding each was the same: the state's evidence, specifically including its evidence regarding the children's lack of medical care and the condition of the family home, was insufficient to support convictions for criminal mistreatment. A defendant may raise an issue that relates to multiple counts without reiterating the issue for each count. Thus, defendant and Drown were not

required to repeat the same argument for each count *seriatim* (or *ad nauseum*).

Any prosecutor or trial court would have understood, as the prosecutor and trial court in this case did, that defendant's and Drown's motions went to each count individually (as motions for judgment of acquittal do). No one would have thought, for example, that, if the motion relating to Count 17—which related to D, the child with vision problems—could be denied, then the motions relating to the other counts could be denied without further analysis.

Indeed, as the above-quoted portions of the record make clear, the state and trial court understood the issue that defendant and Drown raised. In response to Drown's counsel's arguments at the close of the state's case-in-chief, the court itself separately considered the evidence that the youngest child had been dirty, that D had vision problems, and that other children had dental problems. The court observed that the evidence "still has to be tied to the time-frame" and that, "[a]t some point in time," the state would "need to identify what adequate care they're talking about with some specificity." When, in response, Drown's counsel asserted that the state should have done that in its case-in-chief, the court replied that a jury could find that the state had proven the charges, but said, "If I have to revisit this issue after it goes to the jury then I will." The court then told the prosecutor that "this is not a dirty house case" and that the prosecutor needed to "tell me right now where you believe you are." The prosecutor responded by stating that the state's theory was "based on the failure to provide medical care, dental care, the dirty clothes that were testified to, the general living conditions that were too small for the space."

Thus, defendant's motions for judgments of acquittal at the close of the state's case-in-chief put the state and trial court on notice of the issue that the state's evidence regarding her conduct—specifically including her failure to provide medical and dental care—was insufficient to establish that she had withheld necessary and adequate physical care for each of the children. Both the state and the court had the opportunity to respond to the argument and did, in fact, respond to it. Thus, this case is distinguishable from

*McCants / Walker* where our holding was based on our view that it is not "this court's fuction to speculate as to what a party's argument might be." 231 Or App at 578.

Furthermore, although additional preservation efforts were not required, defendant and Drown renewed their motions for judgments of acquittal on the criminal mistreatment counts after the close of the state's rebuttal case. Again, defendant's counsel, Drown's counsel, and the trial court discussed whether the failure to provide medical and dental care constituted criminal mistreatment, and, in an argument defendant adopted, Drown's counsel specifically addressed the evidence regarding the condition of the children's teeth, pointing out that, although some of the children had dental work done after they were taken into DHS custody, there was no evidence that the cavities had not developed "within a couple of months prior to the time [the children] came into custody," and asserted that "it's common knowledge [children] have cavities all the time and they occur suddenly[.]"

In sum, defendant's counsel, Drown's counsel, the prosecutor, and the trial court understood what was at issue and had a full opportunity to play their parts in ensuring that the sufficiency of the evidence on the criminal mistreatment counts was correctly assessed. Therefore, we conclude that defendant properly preserved her argument that the trial court erred by denying her motions for judgments of acquittal on each of the criminal mistreatment counts.

We turn to the merits of defendant's argument, which presents a question of statutory interpretation. As previously noted, ORS 163.205 provides, in part:

"(1)   A person commits the crime of criminal mistreatment in the first degree if:

"(a)   The person, in violation of a legal duty to provide care for another person * * * intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person[.]"

Defendant was charged with knowingly withholding physical care from her children. Defendant does not dispute that she had a legal duty to provide care for her children. But,

she argues that there was insufficient evidence that she withheld necessary and adequate physical care and, even assuming she did, that there was insufficient evidence that she did so knowingly.[6]

The state concedes that "neither the family's unorthodox living situation nor the children's lack of routine medical care and immunizations create criminal liability under ORS 163.205." "However," the state argues, "a rational trier of fact could conclude that defendant's failure to provide needed dental care for the children, and her failure to address [D's] serious vision problems, constitute a failure to provide necessary and adequate physical care." Accordingly, the state argues that there was sufficient evidence to support defendant's convictions on Count 17 (for failing to provide vision care to D) and Counts 18, 19, 20, and 22 (for failing to provide dental care to A, Jo, Ju, and S), but concedes that there was insufficient evidence to support defendant's convictions on Counts 21, 23, 24, and 25 (relating to each of the remaining four children, who did not require vision or dental care after being removed from the home).

Thus, the first contested count is Count 17, relating to D. Defendant recognizes that the state's strongest case against her for first-degree criminal mistreatment was on Count 17. She concedes that D's vision "should have been corrected at some point before it was." She does not dispute that she withheld necessary and adequate care from D; she argues only that the state failed to prove she did so *knowingly*. We reject that argument. Given the degree of D's vision problems—he was legally blind and could not see to read—and the fact that those problems were apparent to others, a rational trier of fact could find that defendant knew D needed

---

[6] In a footnote, defendant notes that the grand jury did not charge her with withholding food or medical attention; it charged her only with withholding physical care. At trial, the state argued that withholding physical care includes withholding medical attention. On appeal, defendant disputes that and asserts that,

"[t]o the extent that the grand jury had actually alleged a different theory of violating ORS 163.205(1)(a)—one that omitted any claim that defendant knowingly withheld necessary and adequate medical attention—defendant's motion for a judgment of acquittal was thus well taken, because the state failed to conform its proof to the indictment."

(Internal citations omitted.) As defendant acknowledges, she did not make that argument in the trial court. Therefore, we do not address it.

vision correction in order to go about his daily tasks safely. Therefore, there was sufficient evidence to support defendant's conviction on Count 17.

The remaining contested counts, Counts 18, 19, 20, and 22, relate to A, Jo, Ju, and S, the children who required dental work after they were taken into DHS custody. Regarding those counts, defendant argues, as she did in the trial court, that the state failed to present evidence that she withheld necessary and adequate physical care during the six-month period of time alleged in the indictment. That argument requires us to determine what the legislature intended when it criminalized the withholding of "necessary and adequate * * * physical care" from dependent persons.

To resolve that question of statutory interpretation, we first turn to the text of ORS 163.205. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). As we have observed in other cases, the legislature did not define "necessary and adequate" for the purposes of ORS 163.205. *State v. Bordeaux*, 220 Or App 165, 171, 185 P3d 524 (2008). "Necessary" and "adequate" are terms of common usage, and we give them their "plain, natural, and ordinary meaning," *PGE*, 317 Or at 611.

> "The definition of 'necessary' includes 'that cannot be done without : that must be done or had : absolutely required : ESSENTIAL, INDISPENSABLE ‹food is ~ for all› ‹was ~ to her peace of mind› * * * ‹took all ~ steps›.' *Webster's [Third New Int'l Dictionary]* * * * 1511 [(unabridged ed 2002)]. 'Adequate' means, as relevant here 'equal to, proportionate to, or fully sufficient for a specified or implied requirement, *often :* narrowly or barely sufficient : no more than satisfactory.' *Id.* at 25."

*Bordeaux*, 220 Or App at 172.

Thus, the text of ORS 163.205 indicates that the statute was directed at the withholding of care that is "absolutely required." It was intended to criminalize the failure to provide for a dependent's "essential" needs in a "sufficient" or "narrowly or barely sufficient" manner. It applies to those who fail to provide for a dependent's most basic needs—such as the need for food, which is specifically included in the statute—for safety and survival.

The legislative history of ORS 163.205 confirms that the legislature was concerned with severe deprivations of care. ORS 163.205 was enacted in 1973 as Senate Bill 708. Or Laws 1973, ch 627, § 3. Initially, the bill was designed to protect elderly persons in nursing homes against neglect and abuse. According to the bill's primary sponsor, Senator Fadeley, the bill was intended to protect against "cruel deprivations" of care. Tape Recording, Special Committee on Aging, SB 780, Apr 9, 1973, Tape 4, Side 2 (statement of Sen Edward Fadeley). His description suggests that the bill was directed at conduct that results in severe or extreme pain or injury. *See Webster's* at 546 (defining "cruel," *inter alia,* as "causing or conducive to injury, grief, or pain" and "SEVERE, DISTRESSING : extremely painful : EXTREME").

In response to a concern about nonelderly persons in nursing homes, the bill was amended to apply to all dependents. When asked about the relationship between the bill and the existing statute prohibiting child neglect, ORS 163.545 (1971),[7] Fadeley said that the bill was directed at conduct that was more egregious than child neglect as defined in that statute, which provided, in part:

"A person having custody or control of a child under 10 years of age commits the crime of child neglect if, with criminal negligence, he leaves the child unattended in or at any place for such period of time as may be likely to endanger the health or welfare of such child."

To commit child neglect by leaving a child unattended, a person must leave the child unattended under circumstances where there is a substantial and unjustifiable risk that the child's health or welfare will be endangered. *State v. Paragon,* 195 Or App 265, 270-71, 97 P3d 691 (2004).

Thus, the legislative history establishes that ORS 163.205 was directed at "cruel deprivations" of care and was intended to apply to conduct more serious than leaving a

---

[7] ORS 163.545 was enacted in 1971. It was amended in 1991 to specify that the prohibited conduct constitutes child neglect in the second degree. Or Laws 1991, ch 832, § 2. The 1991 amendment was necessary because the legislature created a new crime that year—child neglect in the first degree, ORS 163.547—to prohibit persons from allowing children under 16 to be around certain illegal activities involving controlled substances. Or Laws 1991, ch 832, § 1.

child unattended under circumstances where there is a substantial and unjustifiable risk of danger to the child's health or welfare. *See also* Tape Recording, Senate Floor, SB 780, June 29, 1973, Tape 32, Side 1 (statement of Sen Wallace P. Carson) (stating that SB 780, as amended, was directed at "very serious" deprivations).

Considering the text and legislative history, we conclude that, for the purposes of ORS 163.205, a person withholds necessary and adequate physical care when the person withholds care that is absolutely required to meet a dependent's basic safety and survival needs. That standard can be satisfied by withholding care for a condition that causes or will cause serious physical pain or injury.

Accordingly, the question becomes whether defendant's failure to provide dental care to A, Jo, Ju, and S constitutes failing to meet the absolute requirements for their basic safety and survival needs. It is undisputed that defendant never took the children to a dentist. But, as mentioned, the state concedes that defendant's failure to take the children for routine examinations does not constitute criminal mistreatment, and, therefore, the question narrows to whether defendant's failure to provide dental care for the children's dental problems that were treated after DHS took custody of the children, constitutes first-degree criminal mistreatment.

Failing to treat pain and physical injuries can constitute criminal mistreatment, but whether it does depends on the nature of the pain or injury, including the intensity, duration, and consequences of the pain or injury, *see McCants / Walker*, 231 Or App at 581-83, and, accordingly, is to be determined on a case-by-case basis, *Baker-Krofft*, 348 Or at 667 n 5. In this case, the record establishes that four of the children required dental work after DHS took custody of them. A and S needed fillings, and Jo and Ju needed root canals. But, there was no evidence regarding how long the dental problems that necessitated the dental work had existed or, more importantly, whether, during the time period alleged in the indictment, the problems were symptomatic, much less symptomatic to the degree that failing to

secure professional dental care constituted a cruel deprivation of care.

There was nonspecific evidence from which a rational trier of fact could find that at least some of defendant's children had had toothaches in the past; as mentioned, defendant testified that, when her children had toothaches, she would reduce their sugar intake and have them drink lots of water. But there was no evidence about which children had the toothaches or when they had them.

Nor was there any evidence regarding the severity—either in degree or duration—of the toothaches. Thus, there was no evidence from which a rational trier of fact could find that any of the children suffered serious physical pain or injury from the toothaches. There was, for example, no evidence that the children were experiencing symptoms that interfered with their daily activities or were likely to result in serious harm in the long term.

In sum, there was insufficient evidence that defendant withheld necessary and adequate physical care, much less that she did so knowingly. Therefore, the trial court erred in denying defendant's motions for judgments of acquittal on Counts 18 through 25.

Convictions for first-degree criminal mistreatment in Counts 18-25 reversed; remanded for resentencing; otherwise affirmed.