Argued and submitted September 27, 2013, reversed April 9, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANGEL LUELLA ELLEN GOETZINGER,
*Defendant-Appellant.*

Linn County Circuit Court
11010010; A149163

326 P3d 1208

David L. Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael J. Slauson, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Janet A. Klapstein, Senior Assistant Attorney General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

**EGAN, J.**

Defendant appeals a judgment of conviction for one count of criminal mistreatment in the second degree, ORS 163.200. The basis for the charge was defendant's failure to seek medical attention for her infant daughter after discovering that her husband had bruised the child. Defendant assigns error to the trial court's denial of her motion for a judgment of acquittal (MJOA), which was based on the insufficiency of the state's evidence. She also assigns error to the trial court's determination of guilt, contending that the trial court applied an incorrect legal standard in making that determination. We do not address defendant's second assignment of error because we conclude that the trial court erred in denying the MJOA and, accordingly, we reverse.

In reviewing the denial of an MJOA, our task is to determine whether there was sufficient evidence—when viewed in the light most favorable to the state—from which a rational factfinder could find that the state proved each element of the crime beyond a reasonable doubt. *E.g., State v. Wright*, 253 Or App 401, 403, 290 P3d 824 (2012). We recite the following facts in accordance with that standard.

Defendant worked the night shift at Salem Hospital as a certified nursing assistant. After her shift ended, defendant went to do some shopping nearby. While she was shopping, she spoke with her husband, Kent, by telephone. Kent was at their Albany home. Defendant testified that Kent initially told her during that call that he had rolled over on their seven-month-old child, M, and that this had left "a bruise" on M. Later in the conversation, Kent admitted that he had gotten frustrated with the child for keeping him up all night and grabbed her. Defendant stated that her husband sounded "angry and frustrated" during the call. Kent asked defendant to come home, and defendant stated that she would do so. The trial court found that this call took place no later than approximately 9:30 a.m.

At 10:18 a.m., defendant called her mother to speak about the incident; that conversation lasted 43 minutes. Defendant's mother testified, "We kind of both decided it would be best if she would just get home and check on the baby because it just sounded funny, fishy."

Defendant arrived home at approximately 11:30 a.m. Defendant stated that she went upstairs and found Kent and M in bed together. While Kent went outside, defendant took M and examined her. A police officer, Timm, who eventually responded to the scene, testified that defendant had told him that she had seen "fingertip bruises," "very dark bruising," and "bruises [that] were pretty bad" during that examination.

Defendant gave Kent some money, and he left the house to do some shopping. The parties stipulated that defendant called her pediatrician's office at 11:30 a.m. to report "bruises and scratches on the child." Defendant asked for advice about whether she should bring M in for an examination. Somebody from the pediatrician's office "[s]uggested [defendant] take child to [the emergency room] so that they could properly document visit and child [sic]." Mother replied that she would take M to the emergency room.

Defendant spoke with her mother several more times that day. Defendant had sent her sister images of M; when defendant's mother saw one of the images, she testified that "it looked like there were marks on [M's] back," and that, upon seeing the image, she became "upset." When defendant's mother spoke with defendant again, she urged defendant to take M to the doctor and to leave the house; mother testified that defendant's tone over the phone caused her to fear that Kent might harm M. Approximately 20 minutes after that conversation, defendant's mother called the police.

Police officers Timm and Hammersley arrived at the house at approximately 2:15 p.m. Defendant was holding M when Timm met her at the door; Timm observed "bruising to [M's] eye and her head and the side of her neck." Timm requested to examine the child's torso; he testified that he observed "[b]ruising to her arm, her side, some bruising on the back, a bruise on the stomach." According to Timm, defendant had told him that the bruises had faded and did not look as bad as they had when she first saw them. Timm began questioning defendant about the incident; he testified that defendant told him that both her mother and sister had

told her to take the child to the doctor. Timm stated that he interviewed defendant for at least one hour. He also called the Department of Human Services (DHS) for the purpose of getting the child "checked out by a physician."

A DHS worker, Brown, arrived at approximately 3:15 p.m. She testified that she immediately noticed bruising on M's face and around her head and that she was "alarmed immediately." She then proceeded to question defendant about the circumstances of defendant's arrival home that day. After making some telephone calls, Brown told defendant that she was taking M into custody. She then took M directly to the All Because of Children (ABC) House so that M could be examined by a pediatrician, Dr. Chervenak.[1] Brown could not remember the precise time that she arrived at ABC House, but stated that Chervenak performed an examination of M at about 4:30 p.m. Brown was not in the room during the examination, but stated that Chervenak examined and photographed the child. The trial court admitted several of those photographs, which showed bruises and scratches, into evidence. Following the examination at the ABC House, Brown took M to the emergency room, arriving there at approximately 5:30 p.m.

After the state rested its case-in-chief, defendant moved for a judgment of acquittal. Defendant contended that the evidence was insufficient to establish that medical attention was "necessary" as required by ORS 163.200.[2] The state responded by emphasizing that the statute requires proof that medical "attention" was necessary; it argued that there was sufficient evidence on that point based on the evidence of bruising to M, along with the reactions that various witnesses described themselves as having upon seeing M's injuries. The trial court denied the MJOA.

As part of defendant's case, she put on the testimony of a pathologist, Dr. Brady, who provided the only

---

[1] Brown had contacted the ABC House before arriving at defendant's residence; she did so based on what she had been told of the situation by Timm. It is not clear whether Brown brought M to the ABC House for the purpose of having her medically assessed or to document M's injuries as part of a criminal investigation.

[2] The text of ORS 163.200 is set out below, 262 Or App at 224-25.

medical testimony at the trial.[3] Brady stated that he had reviewed M's medical history, Chervenak's reports from the ABC House examination, the photos from that examination, and the results of various tests that were performed on M at the emergency room, including blood tests, x-rays, and a computerized tomography (CT) scan. Brady testified that, after reviewing those items, he concluded that there was "no evidence of any injury on any of the x-rays nor do the photos or Dr. Chervenak's report show, besides the multiple small bruises, any lacerations, tears, swelling, or other changes in this child *** that were to any degree serious or certainly not anywhere near life threatening." He also stated that Chervenak's report did not "document swelling," nor "any significant bleeding" that would be indicative of an injury beneath the skin. When asked on cross-examination whether he would have asked for x-rays "to be cautious" that there were no fractures, Brady responded that he would have done so.

At the conclusion of the bench trial, the trial court found that defendant "did not "really *** do anything *** to try to take the child to see a doctor." It also found that she had known by 9:30 a.m., if not before, that M had been bruised, but continued to shop for some time thereafter. The court also found that the reason defendant did not take the child to see a doctor was that she was concerned about getting her husband into trouble. The trial court adjudged defendant guilty of criminal mistreatment in the second degree, ORS 163.200. This timely appeal followed.

As noted, defendant assigns error to the denial of her MJOA at the close of the state's evidence. ORS 163.200 provides, in relevant part:

"(1)   A person commits the crime of criminal mistreatment in the second degree if, with criminal negligence and:

"(a)   In violation of a legal duty to provide care for another person, the person withholds necessary and

---

[3] Although Brady's testimony was taken after the court had denied the MJOA, we still consider it for purposes of reviewing the denial of the MJOA. *State v. Gardner*, 231 Or 193, 195, 372 P2d 783 (1962) ("[T]he appellate court must consider all the evidence and if it is sufficient to sustain the conviction, the defendant cannot complain that his motion for acquittal made at the close of the state's case was denied.").

adequate food, physical care or medical attention from that person[.]"

The Supreme Court explained, in *State v. Baker-Krofft*, 348 Or 655, 660, 239 P3d 226 (2010), that the crime of second-degree criminal mistreatment consists of three elements: "(1) the defendant acted with the requisite mental state; (2) the defendant had a duty to provide care for a person; and (3) the defendant 'withheld necessary and adequate food, physical care or medical attention' from that person." (Brackets omitted.) In this case, the state charged that defendant had withheld both "necessary and adequate" physical care and medical attention. Accordingly, defendant contends, that the state's evidence was insufficient to support a conviction under either theory. Her argument is limited, however, for she does not contend that the evidence was insufficient with respect to the first two elements of the crime, that she acted with a criminally negligent mental state and that she had a legal duty to M. Instead, she contends that the state cannot establish the "act" element of the crime, *i.e.*, that she withheld "necessary and adequate physical care" or "medical attention" from M.

We conclude, in light of *State v. Drown*, 245 Or App 447, 462, 263 P3d 1057, *rev den*, 351 Or 401 (2011), that the evidence was insufficient to support a conviction for withholding necessary and adequate physical care. Although we discuss *Drown* in more detail below in the context of withholding medical attention, it is sufficient here to note that "a person withholds necessary and adequate physical care when the person withholds care that is absolutely required to meet a dependent's basic safety and survival needs." *Id.* at 464. The state does not here contend—nor did it below in opposing the MJOA—that defendant withheld physical care that was absolutely required to meet M's basic safety and survival needs; the only injuries that M suffered, when viewed in the light most favorable to the state, were deep bruises and some scratches.

The state nonetheless contends that there was sufficient evidence—for purposes of the MJOA—to support a determination that defendant had withheld "necessary and adequate * * * medical attention" from M. The parties present differing interpretations of the phrase "necessary and

adequate \*\*\* medical attention." The core of the parties' dispute on this point appears to concern whether the state was required to prove that medical attention was, as a matter of historical fact, "necessary." The state does not argue that the fact of the bruises rendered medical attention necessary. Instead, the state argues that medical attention was "necessary" in the sense that a professional medical examination was required to diagnose—or rule out the possibility of—any potential internal injuries. Relying primarily on our decision in *Drown*, defendant argues that medical attention is "'necessary' only if withholding it causes or will cause serious pain or injury or, at minimum, a significant risk of such harm." Our function is to determine the intent of the legislature, which we discern by looking at the text and context of the statute, along with any legislative history that is useful to the analysis. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

Whether the withholding of medical attention constitutes criminal mistreatment depends on whether that attention was "necessary," and it is on that point that the case hinges.[4] We first addressed the "necessary" component of ORS 163.200 in *State v. Damofle/Quintana*, 89 Or App 620, 750 P2d 518, *rev den*, 305 Or 671 (1988), a case that the state relies on heavily to support its position. *Damofle/ Quintana* involved whether two parents could be convicted of second-degree criminal mistreatment for withholding necessary and adequate "physical care" from their young children. There was no evidence that the children had been harmed; instead, the parents were convicted because the children were exposed to a threat of harm posed by the "woefully unsanitary living conditions" of their home. We affirmed the convictions, concluding that "[t]he term 'physical care' \*\*\* includes attention to the safety or well being of the body. That attention necessarily includes attention to dangers in the body's environment." *Id.* at 624. We also

---

[4] Defendant does not contend that the state's evidence was insufficient to show that she withheld "adequate" medical attention. Thus, because the withheld medical attention must be both "necessary" and "adequate," we need only to examine defendant's arguments concerning the word "necessary." We also need not dwell on the meaning of "medical attention," for defendant does not dispute that a professional medical examination for the purpose of diagnosing internal injuries falls within the ambit of that term, nor could she plausibly do so.

rejected the parents' argument that the statute required a finding of actual harm, stating that "[s]uch a construction would be inconsistent with the clear language of the statute, which focuses only on the withholding of care, not its consequences." *Id.* at 625. Thus, we concluded that eliminating a risk of harm to a dependent person could constitute "necessary" physical care within the meaning of the criminal mistreatment statutes.

In *Baker-Krofft*, the defendants were convicted under the first- and second-degree criminal mistreatment statutes based on their individual failures to correct potential fire and choking hazards in their homes. 348 Or at 658. As in *Damofle/Quintana*, there was no evidence that the dependent children had actually been harmed. In overturning the convictions, the Supreme Court rejected our conclusion from *Damofle/Quintana* that the term "physical care" broadly encompassed potential environmental dangers. *Baker-Krofft*, 348 Or at 666-67. Instead, after a review of the text, context, and legislative history of the criminal-mistreatment statutes, the court concluded that "a person withholds necessary and adequate physical care from a dependent person when the person keeps back from the dependent person those physical services and attention that are necessary to provide for the dependent person's bodily needs." *Id.* (footnote omitted). Applying that definition, the court turned to consider whether creating, or failing to correct, fire and choking hazards in the home constituted a withholding of adequate and necessary physical care. In the first case, it noted that, although there was evidence of potential fire hazards, it was "uncontested that the child was in good health and that the fire dangers posed only a risk of future harm." *Id.* at 667. Accordingly, the court concluded that there was no evidence that the defendant had withheld a physical service that was "necessary to provide for the child's bodily needs, nor was there any evidence that defendant failed to protect her child from an immediate harm." *Id.* In the second case, involving choking hazards, the court noted that the children were "well fed and healthy"; it concluded that the evidence was insufficient to support an inference that the "defendants had failed to provide for their children's bodily needs or protect them from an immediate harm." *Id.*

We subsequently confronted the issue of "necessary and adequate *** physical care" again in *Drown*, 245 Or App 447. There, the defendant was charged with nine counts of first-degree criminal mistreatment for withholding physical care from her children. In support of those charges, the state presented evidence that the family home was "cramped and cluttered" and that the defendant had failed to take the children for routine medical and dental examinations or to have them immunized. The oldest child testified that he was "legally blind"; the state introduced evidence that two of the children needed fillings and that two others needed root canals. The defendant had never taken the children to a doctor or dentist; when asked what she did when the children had toothaches, she stated that she would "cut back on their sugar to reduce inflammation and to have them drink lots of water." *Id.* at 451 (internal quotation marks omitted). On appeal, the defendant contended that the trial court had erred by denying her MJOA on the criminal mistreatment counts, arguing, in part, that there was insufficient evidence that she had withheld necessary and adequate physical care within the meaning of ORS 163.205.

We first concluded that there was sufficient evidence to prove that the defendant had knowingly withheld necessary and adequate physical care from the oldest child, based on his vision problems. We then turned to examine whether the legislature intended to criminalize the remaining conduct at issue, *viz.*, the withholding of dental care from the other children. We noted:

> "'Necessary' and 'adequate' are terms of common usage, and we give them their 'plain, natural, and ordinary meaning,' [*PGE v. Bureau of Labor and Industries,* 317 Or 606, 611, 859 P2d 1143 (1993)].

> "'The definition of "necessary" includes "that cannot be done without : that must be done or had : absolutely required : ESSENTIAL, INDISPENSABLE <food is ~ for all> <was ~ to her peace of mind> *** <took all ~ steps>." *Webster's* [*Third New Int'l Dictionary*] *** 1511 [(unabridged ed 2002)]. "Adequate" means, as relevant here "equal to, proportionate to, or fully sufficient for a specified or implied requirement, *often :* narrowly or barely sufficient : no more than satisfactory." *Id.* at 25.'

"[*State v. Bordeaux*, 220 Or App 165, 172, 185 P3d 524 (2008)].

"Thus, the text of ORS 163.205 indicates that the statute was directed at the withholding of care that is 'absolutely required.' It was intended to criminalize the failure to provide for a dependent's 'essential' needs in a 'sufficient' or 'narrowly or barely sufficient' manner. It applies to those who fail to provide for a dependent's most basic needs— such as the need for food, which is specifically included in the statute—for safety and survival."

*Id.* at 462 (omissions and some brackets in *Drown*). We then concluded:

"Considering the text and legislative history, we conclude that, for the purposes of ORS 163.205, a person withholds necessary and adequate physical care when the person *withholds care that is absolutely required to* meet a dependent's basic safety and survival needs. That standard can be satisfied by withholding care for a condition *that causes or will cause serious physical pain or injury.*"

*Id.* at 463-64 (emphasis added). We also noted that "[f]ailing to treat pain and physical injuries can constitute criminal mistreatment, but whether it does depends on the nature of the pain or injury, including the intensity, duration, and consequences of the pain or injury." *Id.* at 464. In light of that standard, we proceeded to assess the sufficiency of the state's evidence for purposes of the MJOA. We noted that, although the state had introduced evidence to show that the children had suffered toothaches, there was no evidence regarding the "severity—either in degree or duration—" of those toothaches. *Id.* at 465. Accordingly, we concluded that the trial court erred in denying the MJOA on those counts relating to the dental problems. *Id.* at 464-65.

Finally, in *State v. Worthington*, 251 Or App 110, 282 P3d 24 (2012), we addressed ORS 163.200 in the context of the trial court's failure to give a requested jury instruction. There, the defendant's 14-month-old child had developed a cyst on the side of her neck; eventually, the cyst began to swell, and the child developed cold symptoms and became congested. The defendant did not seek medical treatment, but instead—and consistently with his religious beliefs— began praying, laying hands on the child, and anointing her

with olive oil. The child died from bacterial pneumonia and a blood infection associated with the cyst on her neck. The defendant was convicted of criminal mistreatment in the second-degree based on his withholding of medical attention. On appeal, he assigned error to the trial court's failure to give the following jury instruction:

> "In order to find the defendant guilty of * * * Criminal Mistreatment in the Second Degree, the State must prove that the defendant acted with knowledge that his * * * act or failure to act would bring about the death of [A]. Knowledge requires an awareness on the part of the defendant that *the death of [A] would occur as a result of the defendant's act or failure to act.*"

*Id.* at 114-15 (second omission, brackets, and emphasis in *Worthington*). We concluded that the trial court did not err in refusing to give the requested instruction because it contained an incorrect statement of the law, stating, "Under ORS 163.200(1)(a), the gravamen of the offense is the failure to provide necessary and adequate medical care; the statute does not require that that conduct must lead to the death of another—or, indeed, to any particular result." *Id.* at 115.

Thus, under *Drown* and the cases discussed above,[5] the deprivation at issue has to be one that will likely result in serious physical pain or injury. Bearing that conclusion in mind, the state argues that actual harm to the dependent is not an element of the crime, pointing to both *Worthington* and *Damofle/Quintana* for the proposition that the statute focuses only on the withholding of care, not its consequences. On that point, we agree with the state, for by its plain terms, and as interpreted by the Supreme Court, the criminal mistreatment statutes do not make actual harm to the dependent an element of the crime. *See Baker-Krofft,* 348 Or at 660 (listing the three elements of criminal mistreatment); *Worthington,* 251 Or App at 115 ("[T]he gravamen of

---

[5] Although many of those cases that we have discussed concerned the application of the first-degree criminal mistreatment statute, ORS 163.205, the principles discussed are equally relevant in the context of second-degree criminal mistreatment. As we explained in *State v. Bordeaux,* 220 Or App 165, 170 n 5, 185 P3d 524 (2008), ORS 163.200(1)(a) "employs language identical to that used in the pertinent phrase of ORS 163.205(1)(a), except with respect to the mental state required." *See* Or Laws 1993, ch 364, § 2 (amending the pertinent language of ORS 163.205(1)(a) to mirror that in ORS 163.200(1)(a)).

the offense is the failure to provide necessary and adequate medical care; the statute does not require that that conduct must lead *** to any particular result.").

With that understanding of the foregoing case law, we turn to consider the trial court's denial of defendant's MJOA. When viewed in the light most favorable to the state, we conclude that there was insufficient evidence from which a reasonable factfinder could determine that the medical attention withheld by defendant was "necessary" to alleviate or prevent serious physical pain or injury. As noted in *Drown*, whether the failure to treat pain or injury constitutes criminal mistreatment "depends on the nature of the pain or injury, including the intensity, duration, and consequences of the pain or injury." 245 Or App at 464. The only evidence as to the intensity or duration of M's pain was that M had spent several hours with deep bruises and scratches.[6] There was no evidence that M was crying, otherwise acting abnormally, or that her bruises were worsening with time. Although the fact of the bruises could provide a basis to infer that M was in some discomfort or pain, the state did not present sufficient evidence to show that it was "necessary" for defendant to provide M with professional medical attention. Thus, as in *Drown*, where the evidence of the mere fact that the children had suffered dental problems and associated toothaches was insufficient to establish that the withheld physical care was "necessary," the evidence in this case forms an insufficient basis from which a rational factfinder could infer that it was "necessary" to take M to obtain a medical examination. The trial court erred in denying defendant's MJOA.

Reversed.

---

[6] There was no evidence that the bruises or scratches that M had suffered were indicative of internal injuries. The only medical evidence about potential internal injuries came from defendant's witness, Brady, who testified that serious injuries, such as fractures, are "overwhelmingly associated" with "clear symptom[a]tology" that a mother could "easily recognize," including crying, bleeding, a refusal of food, and an inability to be consoled. As noted, there was no evidence that tended to establish that M was displaying any of those symptoms. Although Brady did testify that he would have ordered x-rays in order "to be cautious," that remark only emphasizes the heightened standard demanded by ORS 163.200, to wit, that the medical attention be "necessary."